UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LINVAL JACKSON, a.k.a. "BIG BANK" | Criminal No. 24-CR-10213-DJC |

**GOVERNMENT'S SENTENCING MEMORANDUM**

From at least 2022 through 2024, Linval Jackson, a.k.a. "Big Bank," was engaged in conspiracies that used stolen identity information of United States citizens to open bank accounts and deposit or attempt to deposit checks that had been stolen from the United States Treasury. In the conspiracy of which he stands convicted here, he led a scheme to steal over $3 million that was intended for a non-profit business that provides care and support to individuals with disabilities, by opening a bank account in the non-profit CEO's name and depositing a stolen $3 million tax credit check into that account. To effectuate this scheme, he provided the CEO's personally identifying information and a fake ID in the CEO's name to his co-conspirator Isaiah Tenryk and sent Tenryk into the bank with instructions to open the account and make the deposit, while Jackson sat safely in his car. Jackson's plan to insulate himself initially worked, and Tenryk was arrested, while Jackson escaped, only to be later identified after further investigation and arrested.

For this conduct, the defendant has pleaded guilty to conspiracy to commit bank fraud conspiracy, bank fraud, and aggravated identity theft, in violation of 18 U.S.C. §§ 1349, 1344, and 1028A(a)(1). The government now asks the Court to impose a sentence of 61 months of incarceration, 36 months of supervised release, and the mandatory special assessment of $300 – representing a significant, though below-guidelines, sentence that appropriately weighs and balances all of the sentencing factors in this case.

## FACTUAL BACKGROUND

The government relies on and incorporates the facts as set forth in the statement of offense conduct in paragraphs 8-31 of the Presentence Investigation Report ("PSR") and includes some of those facts below.

**Background and Relevant Conduct**

Jackson's offenses of conviction were part of ongoing criminal conduct involving stolen checks and stolen identities going back to at least 2022. PSR ¶ 8.

*Jackson's Historical Use of Stolen Identities to Deposit Stolen Checks*

On January 11, 2022, in Greenwich, Connecticut, Jackson was stopped by police while driving a black Audi Q7, with temporary plates. He gave a false name. The police stopped him because a man was trying to open an account at a bank using a fake passport and driver's license for a real person, L.N. The bank denied the application, and the man who had attempted to open the account identified the car he was running to as a black Audi Q7. Jackson pleaded guilty to a related charge in March 2025. At that hearing, the prosecutor recited the facts recited in this paragraph,[1] and Jackson agreed that those facts were correct. PSR ¶ 9.

In about August 2023, Jackson opened an account at "Bank One"[2] in the name of someone with the initials J.J., using a real Social Security number ("SSN"), which belonged to a person with the initials M.R., and a real Pennsylvania driver's license number, which belonged to a person with the initials K.A.N.[3] On October 8, 2023, Bank One required the account holder to provide facial verification. The images uploaded to the bank were a photograph of Jackson, and

[1] The recitation did not include the Audi Q7 by make and model. That information comes from the police report and body camera imagery from the stop.
[2] The actual names of each of the banks discussed in this memorandum are included in the PSR but withheld from this public document.
[3] This conduct constitutes two violations of 18 U.S.C. § 1028A(a)(1), with a predicate either of bank fraud or wire fraud. The U.S. Attorney lacked venue to bring these charges in Massachusetts.

an image of a Pennsylvania driver's license in the name of J.J. but depicting Jackson. Although, as noted below, Jackson used the account in the crimes of conviction, between March and May 2024, he also used the account to deposit ten stolen tax refund checks or other stolen benefit checks payable to other people. Multiple transfers out of the Bank One account went to "Linval Jackson." The account did not have other significant activity. PSR ¶¶ 9-12.

On May 3, 2024, at "Bank Two," Jackson deposited a U.S. Treasury check for $4,918 for a purported tax refund for 2022. Based on IRS records, that check was actually issued to a man in Brooklyn, not Jackson, but had been forged and altered to be payable to Jackson. Jackson later withdrew the funds using a cashier's check payable to himself. PSR ¶ 13.

*Background on Charged Scheme*

S.K. was an individual living in South Carolina. The "CEO" was an individual in New Jersey, who was the CEO of the "Company,"[4] which was a non-profit that helped children and adults with disabilities obtain housing and other services. It had operations in Pennsylvania, New Jersey, and New York. In 2023, the Company applied for and was awarded Employee Retention Tax Credits for all three of its business units, in New York, Pennsylvania, and New Jersey. The tax credit for the New Jersey operation was $3,078,000. The tax credit for the New Jersey operation was issued to the Company in the form of a check payable to the Company and the CEO, but the Company never received the check. PSR ¶14.

In November 2023, unknown persons created a new Gmail account based on the CEO's name. That fake Gmail account was linked at some point by cookie to Jackson's Gmail

[4] The CEO and Company are named in the PSR, but their names are withheld from this public filing.

account.[5] In December 2023 and January 2024, the unknown persons tried to open online bank accounts for the Company using the fake Gmail and then tried to open an account for the Company in Florida. In February, 2024 having not succeeded, unknown persons tried to open an account at a credit union in Connecticut, but again did not succeed. PSR ¶ 15.

*The New York Scheme*

On March 13, 2024, Jackson's friend, who went by the name "Sponge," used Telegram to introduce Jackson to Isaiah Tenryk (who called himself "Ryan Gosling" on Telegram and also used the nickname "Teddy"). Sponge wrote to Tenryk, "Yo Teddy meet my cuzzo Linny. Let's get money." Jackson then messaged the words, "Facts," and attached a document. Tenryk responded, "I'm Widdit," and sent Jackson a copy of his driver's license. On March 18, 2024, Tenryk sent Jackson his photo. Jackson replied, "You think u can pass for forty[?]" PSR ¶¶ 16-17.

On March 26, 2024, Jackson offered to pay Tenryk $1,000 for helping him cash a stolen stimulus check for $10,000. Jackson messaged Tenryk, "What's good I got a play it's for shorts but once we get this we can get more and keep it pushing." He continued, "I got this stim from this [N-word]. Imma make a id and cash it I'll pay you a band." "Stim" means stimulus check, and "band" means $1,000. PSR ¶¶ 16-18.

On March 27, 2024, Jackson asked for Tenryk's height and weight. Tenryk gave him the information. On March 28, 2024, Jackson gave Tenryk identifying information about S.K., including his real SSN and real DOB. Jackson told Tenryk, "U gotta remember his SS." Jackson then picked Tenryk up. Jackson messaged Tenryk paystubs for S.K. and a utility bill for S.K.

[5] Jackson's Gmail account is an account that Jackson used on bank accounts he held in his name and that he provided to the U.S. Probation Office when he forwarded communications with his employer.

Jackson and Tenryk obtained a fake Texas driver's license for S.K., using the height that Tenryk gave Jackson. PSR ¶ 19.

On March 29, 2024, Jackson and Tenryk went to "Bank Three," which is FDIC-insured. Right before he went into the bank, Jackson gave Tenryk an envelope with necessary documentation, including a paystub and utility bill for S.K. Jackson sent Tenryk into the bank and sat in the car. Tenryk's Telegram application in his phone contains minute-by-minute communications between Jackson in the car and Tenryk in the bank, where they successfully opened a fraudulent account. For example, Tenryk asked Jackson, "Which paystub you want me to bring?" Jackson told him, "The Queens." While Tenryk was in the bank, Jackson gave him a contact email and a phone number for the account. He told Tenryk which address to use for mailing, the password to use on the bank account, and the PIN for the ATM card. He had Tenryk get a second ATM card, stating, "Tell him [the bank officer] u need a separate card so you can put money for your daughter in one." Ultimately, they cashed the stolen check payable to S.K. in the amount of $10,730.63. This was a test run. PSR ¶¶ 20-21.

**<u>Offense Conduct: The Boston Scheme</u>**

On or about March 27, 2024, unknown persons incorporated a new version of the Company in Massachusetts. This was not a real subsidiary of the Company, and the real Company had no operations or working addresses or personnel in Massachusetts. PSR ¶ 22.

In April 2024, Jackson gave Tenryk information about the Company and the CEO, including his name, DOB and real SSN, identifiers that Jackson knew belonged to a real person. On about April 19, 2024, Jackson, along with another individual who had created the documentation for the Company, picked Tenryk up at Tenryk's home. The documentation included a fake New York driver's license in the CEO's name but with Tenryk's photo. PSR ¶ 23.

On April 19, 2024, Jackson and Tenryk tried to open fraudulent accounts in the Company and the CEO's name and SSN at as many as three banks. To accomplish the fraud, they had an IRS Form SS-4 from 2012 with the Company's EIN and a printout of the new Massachusetts registration for the Company. They were unsuccessful. PSR ¶ 24.

A few days later, Jackson and Tenryk decided to return to Boston. Again, Jackson picked up Tenryk at his home. On April 24, 2024, they were in Boston and went to multiple banks, including "Bank Four," which is FDIC-insured. As in their prior efforts, Tenryk went into the banks, and Jackson sat in the car, instructing Tenryk by Telegram about what to do and what to ask for and gave Tenryk information to use to complete the account opening. At Bank Four, Tenryk opened the account using the CEO's name and SSN. While Tenryk was in the bank, Jackson messaged Tenryk the fake email account in the CEO's name. He also wanted the bank to issue an ATM card immediately. Jackson messaged Tenryk, "Ask can you expedite ship your card cuz your going on vacation soon." When a bank officer asked about the Company, Jackson told Tenryk, "Just say we help people from group homes find homes." PSR ¶ 25.

Bank Four asked Tenryk to return to the bank with another corporate officer to verify corporate authorization for the accounts. Tenryk did so with an unidentified female accomplice on April 25, 2024, and the bank opened the account and allowed Tenryk/the CEO to deposit a $3,078,000 check into the account. This was the Employee Retention Tax Credit check issued to the Company and the CEO. However, the bank told Tenryk that it had to hold the funds for 10 days because the account was new. Tenryk and Jackson went back to New York. PSR ¶¶ 26-27.

In the following days, unknown persons tried to link the new Bank Four account to other bank accounts and to transfer the money. Among these was Jackson's J.J. account at Bank One. Another account was at "Bank Five," in the name "My Story Matters." Based on ATM

surveillance photos, the person controlling that account was Linval Jackson. Bank Four kept the funds frozen, however. By phone, the bank told an unknown person posing as the CEO that Tenryk had to return to the bank to arrange for wires given the high dollar amounts. PSR ¶¶ 28-29.

On May 10, 2024, Jackson and Tenryk drove back to Boston from New York in a black Audi Q7, in order to make the arrangements for the wire transfers. Before they went to the bank, Jackson got an oil change at Valvoline in West Roxbury. Video from Valvoline shows Jackson as the driver of the Audi Q7.[6] After the oil change, Tenryk entered Bank Four pretending to be the CEO, and the IRS arrested him. Jackson escaped to New York, before he was identified through further investigation and ultimately arrested. PSR ¶¶ 30-31.

## DISCUSSION

### I. Sentencing Guidelines Calculation

Based on its computation of the defendant's Total Offense Level as 24 and Criminal History Category as II, Probation has calculated a Guidelines sentence in this case to include a total term of incarceration of **81 to 95 months**: 57-71 months for Counts 1-2, and 24 months consecutive for count 3. In addition, Probation has computed a Guidelines range of supervised release of up to 5 years for Counts 1-2 and up to 1 year on Count 3, as well as a mandatory special assessment of $100 for each of the three counts. The government concurs with this calculation, and also concurs with Probation's responses to the defendant's Objections to the PSR.

### II. Application of the Section 3553(a) Factors

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of

[6] The Audi's VIN matches the VIN from the Audi in Pennsylvania.

sentencing set forth in § 3553(a)(2). These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide for the needs of the defendant. They also require courts to consider the kinds of sentences available, the GSR, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

The government's recommendation of a sentence of 61 months in prison – representing a 20-month downward variance from the low-end of the guidelines – and 3 years of supervised release takes all these considerations into account, and adequately balances the seriousness of Jackson's crimes, criminal history, and role in the offense, with his acceptance of responsibility, consideration of his unique personal circumstances, the goal of rehabilitation, and the goal of avoiding unwarranted sentencing disparities.

**A. <u>Nature and Circumstances of Offense; Seriousness of Offense; Respect for the Law; Just Punishment; Deterrence; Protection of Public</u>**

The defendant stole the identity of the CEO of a charity that obtains housing and services for disabled individuals so that he could steal a $3 million tax credit check issued to the charity. He was unsuccessful, but the fraud still harmed the charity. As set forth in the Victim Impact Statement submitted herewith under seal, the charity waited over a year to receive the funds it had been expecting – the stolen check that Jackson directed a co-conspirator to deposit into an account Jackson controlled. Absent the needed funds, the charity had to curtail its operations, place programs on hold, and pay lower wages and incentives to employees—all of whom were involved in providing care to a very vulnerable population.

To accomplish his goal of enriching himself at the expense of a charity, the defendant stole and used the CEO's identity. The defendant knew and understood exactly what he was doing. As noted in the PSR, the defendant was involved in a scheme to use a stolen identity to open a bank account as early as January 2022, and in his conspiracy with Tenryk, he used the stolen identity of another person to steal about $10,000. And he knew who he was taking the money from. The defendant was aware that the theft was of a charity – he had Tenryk tell the bank, "Just say we help people from group homes find homes." PSR ¶ 25. Considering his own experience as a parent of a child with a disability, he was aware of how vulnerable the people this organization helped were, yet was not deterred from causing harm. The fact that the theft was from a charity that helps people with disabilities find homes and obtain other necessary services is an aggravating factor.

Moreover, stealing a $3 million check and depositing it, all with the goal of getting the money, does not become nothing because the scheme did not succeed. It is not mitigating that the scheme was unsuccessful. To the contrary, as the Guidelines recognize, loss includes intended loss, precisely because it is the perpetrator's intent that goes to essence of the criminality. The defendant here did everything necessary to complete and succeed in his crime – that he did not succeed was because of the vigilance of Bank Four, not any mitigating factor as to the defendant.

Additionally, it is an aggravating factor that this was the sort of conduct that the defendant had engaged in numerous times previously. *See* PSR ¶¶ 9-13. This defendant intended to steal money by stealing identities. The scheme as to the Company was not a one-off event. It was not a mistake. It was not an error in judgment. It was a further instance of an established course of conduct. It is fair to assume that many of the checks that Jackson and his co-conspirators fraudulently deposited were to persons of moderate means for whom such a tax refund or credit

would have made a significant difference. The fact that the money being stolen, like the check payable to the Company, would have come from the U.S. Treasury and not from the payee is no mitigation at all. The checks were intended for real individuals to have money in their pockets, just as the check to the Company was intended for the Company to have money in its accounts to pay expenses and wages and carry out its charitable mission.

This defendant will likely be specifically deterred by any sentence the Court imposes given the mandatory minimum 24-months required by 18 U.S.C. § 1028A. This defendant justly merits greater punishment, however, given the nature of the crime. To promote respect for the law – all of the laws that Jackson was charged with violating, not just Section 1028A – the Court's sentence should not treat the fraud as if it were nothing. This defendant intended a very significant theft and attempted to steal those funds knowing they belonged to a charity. That theft, standing alone, merits just punishment, separate and apart from the aggravated identity theft of the identity of the CEO. Each crime has a separate and distinct victim and harm, both to the victim and to society.

This is also the kind of crime that requires general deterrence. As is evident, this defendant was connected to a network of persons who traffic in stolen U.S. Treasury checks. He was also connected to persons who fabricate false identity documents. Those other individuals – like the defendant himself – were somewhat insulated from the risks that Tenryk faced as the individual sent into the banks. The sentence in this case needs appropriately to deter fraudsters who believe that they can enjoy the rewards of crime with little personal risk, because they are behind the scenes, pulling the strings.

**B. The Defendant's Personal Characteristics**

The defendant suffered a terrible tragedy at the age of six, when his father was shot and killed, interrupting his childhood. The ripple effects of that tragedy continued through his life,

with the family suffering emotional and financial hardships and experiencing homelessness at times. The defendant's teenage years were turbulent, as he spent some time living in a group home and moved around several other family members' homes. PSR ¶¶ 64-66. Nevertheless, for the last decade, Jackson has enjoyed a stable living situation with his grandmother, and he maintains close relationships with his siblings. PSR ¶¶ 67, 69-75. He has three children, and provides at least some care for each of them. He has 50% custody of his middle daughter, who has a rare genetic condition that requires significant care, including therapy multiple times a week. PSR ¶¶ 80-81. The defendant has submitted a sentencing video demonstrating some of the care that his daughter needs, that he helps to provide.

While the defendant's role as a caretaker for his children, and especially his middle daughter, is admirable, and the government does not doubt his love for her or hers for him, the many ways that his presence enriches her life, and the challenges that both of them and the entire family will face as a result of whatever sentence this Court imposes, the government is mindful of the fact that this is true for many families in which a parent has committed a crime that results in separation from their children, even where the children's needs are less significant. The video submitted by the defendant demonstrates that, while he serves an invaluable and irreplaceable role in his daughter's life, she also has numerous family members who are employed, who love her, and who are committed to providing the care that she needs while the defendant serves his sentence. And the fact remains that the defendant committed this conduct – attempting to steal from a charity that aids other people with disabilities, a crime that he knew could result in separation from his daughter if he was caught – while in this caretaker role. Accordingly, while the government has carefully considered the defendant's home situation in making its

recommendation for a downward variance, the government does not believe this factor overrides all of the other sentencing factors the Court must consider.

**C. Avoiding Unwarranted Sentencing Disparities**

The government's requested sentence of 61 months is necessary to avoid unwarranted sentencing disparities, both vis-à-vis defendants convicted of similar conduct nationwide, and vis-à-vis Jackson's co-conspirator Isaiah Tenryk.

**Avoiding unwarranted disparities nationwide**

Putting the mandatory 24-month sentence for the Section 1028A violation to the side, because it addresses a free-standing crime with a distinct harm, a sentence of 37 months for the fraud in this case would not be an unduly harsh sentence; to the contrary, it would be lower than average for this sort of fraud. According to Sentencing Commission data, from 2020 to 2024, there were 53 defendants at total offense level 24 with USSG § 2B1.1 as the principal guideline. Of those, 98 percent received a sentence of incarceration. The average and median lengths of imprisonment were 50 and 48 months, respectively. *See* JSIN Data.[7]

Moreover, considering both crimes together, for the 7 defendants who also had a mandatory minimum under 18 U.S.C. § 1028A, the average and median length of imprisonment were 61 and 60 months respectively (i.e., a sentence of 36-37 months in addition to the 24-month mandatory sentence on the § 1028A count). *See* PSR ¶ 124.

This is not an average or median case, given the vulnerability of the clients of the intended victim and given this defendant's involvement in longer course of conduct involving fraud through identity theft. Accordingly, the government's recommendation of an average or median sentence according to JSIN data does not create unwarranted sentencing disparities vis-à-vis defendants

[7] https://jsin.ussc.gov/analytics/saw.dll?Dashboard

nationwide, and properly reflects both the aggravating factors and the mitigating factors discussed above, as well as the need for the sentence to be proportionate to culpability vis-à-vis his co-conspirator.

**<u>Avoiding unwarranted disparities with co-conspirator</u>**

The government's recommendation also recognizes the need to avoid *unwarranted* disparities with Jackson's co-conspirator Isaiah Tenryk. In Tenryk's case, the Court imposed a sentence of 36 months, representing a 21-month downward variance from the low-end of Tenryk's GSR. PSR ¶ 6.

Here, the government is requesting a sentence of 61 months, representing a 20-month downward variance from the low-end of Jackson's GSR. This sentence would appropriately take into account the fact that Jackson is significantly more culpable than Tenryk – Jackson was the leader of the conspiracy who sent Tenryk in to do the high-risk work while he sat in the car, insulated, and nearly escaped responsibility. A significantly higher sentence is appropriate to reflect that significant difference in culpability. Additionally, Tenryk was in Criminal History Category I, whereas Jackson is in CHC II. The higher sentence takes into account Jackson's more extensive criminal history. Although Jackson's family situation is a mitigating factor that Tenryk's case did not involve, Tenryk's case involved other mitigating factors that Jackson's does not.

Here, the GSR points to a sentence of 81 months. The government agrees that this is too high, in light of Tenryk's sentence – Jackson should not receive a sentence more than twice as high as Tenryk's. But his sentence should be significantly more than Tenryk's to properly reflect his greater culpability as a leader/organizer who insulated himself from risk. The government's recommendation of 61 months strikes the appropriate balance.

## CONCLUSION

For foregoing reasons, the Court should impose the sentence requested by the government. The United States does not seek remand of the defendant upon sentencing and does not oppose a self-report date that, within reason, allows for the development of a plan for the coordination of care for his middle daughter in particular.

Respectfully submitted,

UNITED STATES OF AMERICA
By its attorney,

LEAH B. FOLEY
United States Attorney

*/s/ Elianna J. Nuzum*
Elianna J. Nuzum
Assistant United States Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
elianna.nuzum@usdoj.gov
617.748.3100

Dated: January 23, 2026

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Elianna J. Nuzum*
Elianna J. Nuzum
Assistant United States Attorney

Dated: January 23, 2026